**SIMMON'S, INC., Plaintiff,**

v.

**PINKERTON'S, INC. and National Surety Corporation, Defendants.**

**Civ. No. H80–5.**

United States District Court, N.D. Indiana, Hammond Division.

Jan. 19, 1983.

---

James D. Steiner and David F. Herr, Minneapolis, Minn., and Leon Kaminski of Newby, Lewis, Kaminski & Jones, LaPorte, Ind., for plaintiff.

Harry J. Jennings of Spangler, Jennings, Spangler & Dougherty, Merrillville, Ind., for defendants.

## ORDER

MOODY, District Judge.

The Court presently addresses defendant's Motion to Disqualify Counsel dated April 3, 1981. The motion is one part of a civil action commenced by Simmon's, Inc. to recover damages occasioned by a fire which occurred on September 25, 1978 in Munster, Indiana. Simmon's seeks recovery from Pinkerton's based upon the conduct of one of Pinkerton's guards during the afternoon and evening of the date in question.

Defendant's motion seeks to disqualify Simmon's present counsel, attorneys in the law firm of Robins, Zelle, Larson & Kaplan (Robins II), because in an earlier case, *Guardsmark v. WCCO–TV,* the predecessor of Robins II, Robins, Davis & Lyons (Robins I) had represented Pinkerton's in an action seeking injunctive relief against a television station which was televising an exposé on security guard companies. In *Guardsmark,* Robins I assigned Mr. Larson and Mr. Feinberg to represent Pinkerton's. Mr. Feinberg withdrew from Robins I in January, 1978, however, Mr. Larson was still with Robins I when the instant case was filed on January 4, 1980. The attorneys who filed the instant case are James Steiner and David Herr, both with Robins I on that date. Sometime after the January 4, 1980 filing of the instant case, but before October 14, 1980,[1] Robins I became Robins II, the firm now representing Simmon's. Mr. Larson, Mr. Steiner, and Mr. Herr are in some capacity with Robins II. Mr. Larson and Mr. Steiner had also been with Robins I when *Guardsmark* was an active case within the files of Robins I. Quite simply, Pinkerton's moves to disqualify the attorneys of record, Mr. Steiner and Mr. Herr, and the firm of Robins II, because the representation in *Guardsmark,* given this relationship among Robins I and Robins II, raises an ethical conflict.

---

1. The precise date is not reflected by the record, however, the first time Robins II appears on materials in the record is October 14, 1980.

Pinkerton's argues that Mr. Larson possesses privileged or confidential information from the *Guardsmark* representation of Pinkerton's, which is imputedly in the possession of Mr. Steiner and Mr. Herr while they represent Simmon's in prosecuting the instant civil action against Pinkerton's. Although the record in this case does not reveal any privileged or confidential information Mr. Larson might have obtained from the *Guardsmark* representation, Pinkerton's, nevertheless, contends that any privileged or confidential information which might have been relevant to the issues in *Guardsmark* is presumed to be in Mr. Larson's and thus Mr. Steiner's and Mr. Herr's possession. Pinkerton's cites *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706 (7th Cir.1976), and *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186 (7th Cir.1979) for this proposition. Pinkerton's argues that this presumption is warranted because there is a "substantial relationship" between the *Guardsmark* representation and the Robins II representation of Simmon's in the instant case. Underlying this contention is Pinkerton's argument that Pinkerton's hiring, selection, training, and supervision practices, which form the gravamen of three of the five counts of Simmon's complaint, were also factual issues in *Guardsmark* where Robins I, specifically Mr. Larson, represented Pinkerton's.

This matter was referred to the United States Magistrate for disposition and a hearing was held on June 7, 1982. The Magistrate concluded that there was not a "substantial relationship" and, accordingly, ordered that Pinkerton's motion to disqualify be denied. Shortly thereafter, Pinkerton's filed objections to the Magistrate's order of June 28, 1982, and further requested that this Court make a *de novo* review and reject the Magistrate's decision. Since Pinkerton's objections were filed, the Court of Appeals for the Seventh Circuit decided *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7th Cir.1982). According-

ly, this Court reviews *de novo* Pinkerton's motion with the additional guidance provided by *Freeman.*

*Freeman* concerned the disqualification of counsel where ethical considerations were raised under Canons 4 and 9 in a circumstance where an associate of a law firm representing a party was previously an associate of a law firm which had represented the adverse party in a prior cause. Although the Seventh Circuit noted that Canons 4 and 9 were implicated in that circumstance, and that disqualification may be a proper measure to protect the attorney-client relationship, disqualification was nonetheless a drastic measure to be imposed only when absolutely necessary to preserve that relationship. The Seventh Circuit urged extreme caution in these cases because not only does disqualification disband an existing attorney-client relationship of the party's own choosing but also disqualification motions might be misused as a technique of harassment. Having made mention of these concerns, the Seventh Circuit then established the appropriate analysis for cases of this kind.[2]

▮ The *Freeman* analysis begins, as did the Magistrate's in this case, by initially determining if a "substantial relationship" exists between the prior representation and the present litigation. To make this determination the Court must first "make a factual reconstruction of the scope of the prior legal representation." Then, the Court must determine "whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters." Finally, the Court is to determine if "the information is relevant to the issues raised in the litigation pending against the former client." If the Court after these inquiries determines that a "substantial relationship" exists, the Court must presume (implicitly) that particular individuals in a law firm freely share their client's confi-

---

**2.** While the counsel of record are not the same in both *Guardsmark* and the instant case, the same concerns arise if there is a "substantial relationship" established. Thus, the Court uses the *Freeman* analysis in the present case.

dences with one another. Hence, knowledge of these confidences are imputed to other particular members of the law firm. The presumption that the confidences were shared with the representing attorney and that other members of the firm are privy to that knowledge is, however, a rebuttable presumption, as *Freeman* clearly states. *Freeman*, 689 F.2d at 722. Hence, this Court's task is clear—a two step inquiry must be conducted:

(1) Is there a "substantial relationship" between the *Guardsmark* representation by Mr. Larson and Robins I, and the instant litigation where Mr. Steiner and Mr. Herr and Robins II prosecute a former client that will raise a rebuttable presumption that confidential information is possessed by Mr. Steiner and Mr. Herr necessitating disqualification?

(2) If the presumption has arisen, have Mr. Steiner, Mr. Herr and Robins II rebutted the presumption?

To answer these questions the Court has reviewed the record relevant to the disqualification motion and listened to the tapes of the Magistrate's hearing of June 17, 1982.

In answering the first question, the Court's review discloses that Robins I in *Guardsmark* represented Pinkerton's in a limited and short-lived capacity. Mr. Larson attended only one meeting and that meeting was attended by numerous representatives of various security guard companies interested in the television station's exposé (Exhibit B to Defendant's Motion to Disqualify; Larson Affidavit at 2). The discussion at the meeting involved a review of the television program and potential violations and possible courses of action to be taken (Exhibit B to Defendant's Motion to Disqualify; Larson Affidavit at 2). The limited scope of Mr. Larson's and Robins I's participation in the *Guardsmark* representation is also evidenced by the Affidavit of Mr. McQuillan, Pinkerton's present counsel. In paragraph 2, Mr. McQuillan states that the only records in Pinkerton's possession regarding the *Guardsmark* representation by Robins I are Exhibits A and B attached to the Motion to Disqualify. Exhibit A is a bill for services and costs dated March 8, 1974 and Exhibit B is a letter dated June 4, 1973 from Mr. Larson to Pinkerton's then vice-president and general counsel, Mr. Horan. Neither of these exhibits provides sufficient material to define the precise scope of Mr. Larson's and Robins I's participation in *Guardsmark* although Exhibit B does define objections and possible courses of action for the litigation. Notably absent from Exhibit B, however, is any discussion of documentation or other materials which might have been transmitted by Pinkerton's to Robins I or Mr. Larson. Moreover, as mentioned by the Magistrate in his order of June 25, 1982, Pinkerton's has not provided the Court with any documents or materials filed in *Guardsmark* which would evidence the scope of that litigation. A review of the tapes of the Magistrate's hearing also does not reveal any materials or documents which would assist the Court in defining the scope of either *Guardsmark* or Robins I and Mr. Larson's participation in *Guardsmark*. *Guardsmark* was finally disposed of by a settlement agreement; however, that agreement has also not been submitted to this Court for consideration. Thus, with only the two exhibits, Mr. McQuillan's affidavit, the conflicting characterizations of the scope of *Guardsmark*, and affidavits submitted by Robins II on their behalf, the Court is to factually reconstruct the scope of the *Guardsmark* representation of Mr. Larson and Robins I.

■ The Magistrate concluded that there was no substantial relationship and this Court is inclined to agree because the record is sparse and provides an inadequate basis upon which to determine whether Pinkerton's or Robins II's characterization of the scope of the *Guardsmark* representation is most appropriate. The Court has been unable to locate any case law defining the initial burden that Pinkerton's must satisfy under the substantial relationship test. It appears, however, that the Court must give the movant the benefit of any doubt if any logical factual reconstruction which can be made supports the movant's

position. Viewed from this premise, the Court is still hesitant to conclude that the scope of *Guardsmark,* when factually reconstructed, approaches the context of the present litigation.

Mr. Larson and Robins I attended only one meeting. The meeting's purpose was to review the television program and define possible violations of state and federal law by the television station. Mr. Larson then wrote a letter to Pinkerton's then vice-president and general counsel delineating his views on strategy and the probability of success under various courses of action. No further materials are revealed by the record to evidence any expansion on the scope of Robins I other than this. Proceeding from this factual reconstruction to the second step in finding a "substantial relationship" under *Freeman*—"whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters"—the Court concludes that the limited scope of the representation does not render it reasonable to infer that the confidential materials or information were transmitted to Robins I. Rather, the more reasonable inference is that Robins I was enlisted in an advisory capacity to formulate potential courses of action. The letter, Exhibit B to Pinkerton's Motion to Disqualify, evidences advice on general issues of defamation law and constitutional law. Specific facts are not mentioned, nor are plausible defenses suggested in the letter supported by reference to any documents or materials relating to Pinkerton's hiring, selection, supervision, or training practices. Thus, the question this Court must answer is whether based on this factual reconstruction made of the prior litigation, is it reasonable to infer confidential matters would have been given to the lawyer in that previous case. In this case, the answer is no. The *Guardsmark* representation was limited to an advisory capacity, a capacity confined to general propositions of law. Under those circumstances it is not reasonable to infer that specific materials concerning details about Pinkerton's hiring, selection, training, and supervision practices would have been given to Mr. Larson or Robins I.

If, of course, those materials had been provided to Robins I, those materials would undoubtedly be relevant to the present litigation. As noted earlier, the gravaman of three of the five counts in Simmon's complaint is the hiring, selection, training, and supervision practices which Pinkerton's follows. Without question, the practices specifically relating to the Pinkerton guard on duty the day of the fire are material evidence in this case. Thus, if the Court were to determine that the factual reconstruction was such as to permit a reasonable inference that Mr. Larson would have been given the confidential information the Court would have determined a "substantial relationship" exists.

The Court, however, finds no "substantial relationship" between the two cases and accordingly declines to presume that the confidential information allegedly in Mr. Larson's possession is available to Mr. Steiner and Mr. Herr or other members of Robins II. Even if the Court were to transgress what it believes the record substantiates in this case, the Court would, nevertheless, deny Pinkerton's Motion to Disqualify Counsel. The record in this case is such that even were the Court to determine a "substantial relationship" and presume the confidences to be within Mr. Steiner's and Mr. Herr's, Robins II has submitted uncontroverted affidavits to rebut the presumption arising from any supposed substantial relationship.

Robins II has filed five affidavits with their response in opposition to Pinkerton's Motion to Disqualify. The five affidavits on file were sworn to by Mr. Larson, Mr. Herr, Mr. Patrick (a partner in Robins II), Mr. Zelle (a partner in Robins II), and Mr. Steiner. Both Mr. Steiner's and Mr. Herr's affidavits deny having access to Robins II's files concerning *Guardsmark,* and having had any discussions either directly or indirectly with respect to the merits, information, or other circumstances relevant to *Guardsmark.* Mr. Larson's affidavit describes the limited scope of the *Guardsmark* representation, but more important at this

point is his statement evidencing that no discussions have been had with any attorneys of Robins II involved in actions against Pinkerton's. Mr. Zelle's affidavit similarly reveals that Robins II was aware of the prior representation of Pinkerton's and that Robins II took internal measures to isolate any attorneys who had previously worked on *Guardsmark* from Mr. Steiner and Mr. Herr. Equally important, Mr. Zelle's affidavit reveals that any files of Robins II which concern *Guardsmark* are now reduced and retained only in microfilm and that all attorneys involved in actions prosecuting Pinkerton's are not to have access to those microfilms. Of equal interest is Mr. Zelle's statements concerning an action now pending in the United States District Court in Grand Rapids, Michigan. That case also is one in which Robins II represents a party prosecuting a civil claim for damages occasioned by a fire against Pinkerton's. Yet, interestingly enough no Motion to Disqualify Counsel has been filed in that case according to the affidavit of Mr. Herr. Mr. Patrick's affidavit is of limited value other than to add that Robins II has participated in a routine collection action at the behest of Mr. Horan, a New York attorney. The picture which emerges from this collection of affidavits is one which denies that any materials of a confidential nature were transmitted to Mr. Larson or Robins I and that despite this absence, Robins II has taken special care to isolate Mr. Steiner and Mr. Herr both from the files concerning *Guardsmark* and from conversations concerning that litigation with any attorneys of Robins II who might have had a connection with the *Guardsmark* case. Accordingly, even were the Court to have found that a "substantial relationship" existed, the Court would have denied Pinkerton's motion because the uncontroverted affidavits on file rebut the presumption.

The Court resolves the present motion against Pinkerton's, having found that no "substantial relationship" exists. Accordingly, Pinkerton's Motion to Disqualify Counsel is DENIED.

